Filed 2/27/25  In re G.A. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.A., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E084683 |
| Plaintiff and Respondent, | (Super.Ct.No. DPSW2200050) |
| v. | OPINION |
| Neftali A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.

Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

Neftali A. (Father) appeals from the termination of his parental rights to his minor son, G.A. He contends that the juvenile court erred by failing to apply the beneficial parental relationship exception under subdivision (c)(1)(B)(i) of Welfare and Institutions Code section 366.26 (unlabeled statutory references are to this code). We affirm.

BACKGROUND

I.      *Detention*

In July 2022, Riverside County Department of Public Social Services (DPSS) received a report from Los Angeles County Department of Children and Family Services, stating that while G.A.'s paternal aunt was visiting G.A.'s paternal grandmother, Father hit the paternal aunt during a physical altercation. The paternal aunt reported that Father, Mother, and G.A. were living with the paternal grandmother, and the paternal aunt did not know how long they had been there.[1] The paternal aunt called the police, and the parents left before the police arrived. G.A. was six months old at the time.

The following month, DPSS interviewed Mother at the maternal great-grandmother's home, where Mother was living. Mother said that she did not live with Father and that neither she nor G.A. was involved in the incident between Father and the paternal aunt. Mother denied current substance abuse but admitted that she had a history of abusing substances. DPSS was unable to make contact with Father.

Later that month, DPSS received an immediate response referral alleging that the parents had an argument about taking G.A. to the doctor. As Mother was leaving with

_____

[1]      Mother is not a party in this appeal.

G.A., Father pushed Mother's thighs and face into the couch. Father followed Mother, and as Mother put G.A. into his car seat, Father got into the driver's seat to prevent Mother from leaving. Father then got into his car and drove into Mother's car to block her. Mother and G.A. were in her car when Father drove into it. The parents eventually agreed to take G.A. to the doctor together, but they forgot G.A.'s bottle and turned around to get it. While Father went to get the bottle, the paternal aunt took G.A. and called the police. Father fled on foot before the police arrived. Mother's temple was red, and she had a cut on her lip. G.A. was uninjured. The paternal aunt told the social worker that Father does not take care of G.A. when he visits, and relatives need to help feed G.A.

DPSS went to Mother's home and spoke to the maternal great-grandmother. The maternal great-grandmother stated that the parents were always fighting. She described Father as "very demeaning and possessive." She said that there have been multiple incidents of domestic violence, and Father sometimes shows up unannounced and takes G.A. with him. The maternal great-grandmother also told DPSS that she does not believe that Mother is currently using drugs but acknowledged that Mother has a history of substance abuse. The maternal great-grandmother told DPSS that Father uses heroin and "[possibly] fentanyl" and that he sells drugs.

DPSS tried to contact Father, but he did not answer. DPSS spoke to D.P., a minor paternal aunt, who said that she saw Father hitting Mother during the altercation, and G.A. was watching with a "blank stare." D.P. stated that she was unable to count the number of times that the parents engaged in domestic violence. She said that Father was

3

using drugs and that she found drug paraphernalia in Father's car earlier that day. She was concerned about Father's ability to care for G.A. because he had been unable to do so in the past.

The following day, DPSS spoke to Mother again. Mother described her relationship with Father as "'terrible and with lots of chaos.'" Mother said that she had a criminal history involving drugs and that she had used heroin and methamphetamine in the past. DPSS asked if Mother would take a saliva drug test, and Mother refused. Mother told DPSS that Father smokes methamphetamine, and Mother tested positive for amphetamine the next day.

DPSS placed G.A. into protective custody and filed a section 300 petition alleging that G.A. was at serious risk of physical or emotional harm because of the parents' domestic violence in G.A.'s presence; that the parents have a child welfare referral history with allegations of general neglect; that the parents have a criminal history; that Mother abuses controlled substances and has a history of substance abuse; that Father has a history of substance abuse; and that Father's whereabouts were unknown, and he was unable or unwilling to care for G.A.

At the detention hearing in September 2022, the juvenile court detained G.A. from both parents. The court ordered supervised visitation for the parents and granted a temporary restraining order prohibiting Father from contacting Mother or coming within 100 yards of her.

II.     *Jurisdiction and disposition*

Father called DPSS later that week and provided a telephone number and mailing address where he could be reached. He told DPSS that he was homeless and that he usually borrowed a phone from a friend. Mother reported that Father had not been a part of G.A.'s daily life and that when she brought G.A. to see Father in June, he assaulted her and took G.A. with him.

The paternal aunt reported that Father was responsible with G.A. when Father was not using drugs. Mother would sometimes leave G.A. with Father for "days at a time," and Father would not take adequate care of G.A. when he was using drugs. The paternal aunt also reported that on one occasion, she told Father that he should be caring for his child, and Father pushed her while she was holding G.A. She told DPSS that she believed that Father was using methamphetamine "for a while" and that Mother was using drugs. She said that Mother has used methamphetamine, heroin, and fentanyl, and she believed that Mother got the drugs from Father.

Mother agreed to take a saliva drug test at her home, and she tested positive for methamphetamine. Mother admitted drug use and told DPSS that heroin was her drug of choice.

G.A.'s caregiver, the paternal aunt, reported that G.A. was sleeping better than when he first arrived. The paternal aunt also reported that G.A. was rolling over and "sliding backwards on his knees." She said that G.A. was using a walker to walk around the home, pinching and grabbing for things, and improving his coordination. She denied having any concerns about G.A.'s mental and emotional status. DPSS reported that

5

G.A.'s placement was suitable to meet his needs and that the paternal aunt showed interest in adopting G.A. if he was unable to return to his parents' care.

In an addendum report, DPSS reported that Mother had tested negative for drugs in September 2022. DPSS also reported that Father stated that he was willing to visit with G.A. DPSS observed the paternal aunt's home, which was neat, organized, and free of hazards. The paternal aunt had provisions to care for G.A., and G.A. was dressed appropriately. He had no marks or bruises and appeared healthy. The paternal aunt told DPSS that Father often calls G.A. and that he had called G.A. on the previous day. G.A. recognized Father's voice.

DPSS reported that during Father's first visit with G.A., Father took G.A. out of his car seat and played with him. Father read to him and kissed and hugged him. Father changed his diaper, and when the visit ended, Father buckled him into his car seat, kissed him, and said goodbye. Father left with tears in his eyes. DPSS reported that Father was appropriate and did not need any redirection.

DPSS spoke with Father a few days later and informed him that he had tested positive for amphetamine and methamphetamine the day before his visit with G.A. Father said that he had last used drugs six days before the test, and he stated that he has been sober for two weeks.

At Father's next visit, Father tested negative for substances. Father was excited to see G.A., and they played together. Father showed G.A. books and toys, watched him crawl, and picked him up to dance. Father spoke to him in English and Spanish, and

there was a lot of interaction between them. Father brought a box of diapers, wipes, and toys for G.A., and DPSS noted that the visit went well.

Father had not begun his substance abuse treatment, and Mother had missed three visits with G.A. DPSS noted that it was concerned about the parents' continued substance abuse, Mother's missed visits, and Mother's unavailability.

At the contested jurisdiction and disposition hearing in November 2022, the juvenile court sustained the petition as amended, removed G.A. from both parents' custody, and ordered reunification services and monitored visits for both parents.

III.    *Reunification period*

In the six-month status review report, DPSS reported that G.A. was "very bonded" with the paternal aunt and called her "'Mama.'" He was thriving in the paternal aunt's home, and all of his needs were being met. The paternal aunt provided a stable environment without the presence of drug use or violence.

Father visited G.A. weekly, and the visits went well. In March 2023, Father began visiting G.A. at the paternal grandmother's home, and the paternal aunt reported that the visits appeared to have gone well. The paternal aunt noted that she did not believe that the paternal grandmother would report a visit that did not go well, because the paternal grandmother enables Father. DPSS reported that Father had not yet addressed the reasons for G.A.'s removal and had not completed his substance abuse program.

At the six-month review hearing in April 2023, the juvenile court found that Mother's progress toward alleviating or mitigating the causes necessitating G.A.'s placement was adequate and that Father's progress was minimal. The court found that

7

there was a substantial probability that G.A. may be returned to the parents within six months and ordered that the parents' reunification services be continued. The court authorized DPSS to liberalize the parents' visitation with G.A. to include unsupervised and overnight visits.

In its 12-month review report, DPSS reported that Father had not been responding to calls but would reply by text message. Father was unemployed, and DPSS did not know how he was financially supporting himself. DPSS also became aware that there was an active bench warrant for Father for possession of controlled substances and possession of drug paraphernalia.

G.A., who was nearly one and one-half years old at the time, was healthy, could walk, run and climb, and was saying two- and three-word sentences. He knew Mother and Father, and he was "very attached" to the paternal aunt. DPSS reported that his attachment to the paternal aunt was expected because she had been caring for him for over one year. He was thriving with her, and his needs were being met.

Father reported that he had completed 26 weeks of substance abuse treatment. He was unable to provide DPSS with a certificate of completion. Father also completed a parenting program. Father failed to complete his anger management program, and he failed to show up for on-demand drug testing. Father blamed DPSS for his situation, and he stated that he did not need substance abuse treatment, because he was not an addict.

Father continued to visit G.A. at the paternal grandmother's home. The visits were positive, and Father interacted with G.A.

Meanwhile, Mother had been doing well, and DPSS reported that it would not be detrimental to return G.A. to Mother's custody with family maintenance services. DPSS also reported that Father had made minimal progress on his case plan and that it would not be in G.A.'s best interest to place him with Father.

At the 12-month review hearing in October 2023, the court found that Mother's progress toward alleviating or mitigating the causes of G.A.'s removal was adequate and that Father's progress was minimal. The court returned G.A. to Mother's custody and ordered family maintenance services for her. The court further found that Father failed to make substantive progress in his case plan and that there was no substantial possibility that G.A. would be returned to his care if given another six months of reunification services. The court terminated Father's reunification services and ordered that Father take a drug test. The court also ordered that Father could continue to visit once per week if he tested negative. Otherwise, Father's visits would be reduced to one time per month.

IV. *Section 387 petition*

In February 2024, DPSS detained G.A. and placed him with the paternal aunt on an extended visit pending approval for his placement there. DPSS had received a call from the paternal aunt, who reported that Mother had left G.A. at the paternal grandmother's home without saying when she would return or providing any instructions for G.A.'s care. The paternal aunt called hospitals, and DPSS checked local county jails' websites to try to locate Mother. Father had not heard from Mother either. Mother's therapist reported that Mother had not shown up for counseling.

9

DPSS filed a supplemental petition alleging that Mother failed to provide adequate care for G.A. by leaving home and failing to return.  DPSS was concerned that Mother was abusing substances again because she had failed to comply with court-ordered drug testing, and she failed to participate in court-ordered substance abuse services.  Mother had been missing for approximately two weeks.

The juvenile court detained G.A. and ordered supervised visits for Mother. Father's prior visitation order remained unchanged.

G.A. was thriving in the paternal aunt's home.  He was healthy and active, and his language skills were "very developed."  The paternal aunt had toys for him and activities to stimulate learning.  He was learning his colors and learning to count.

Father continued to visit G.A. at least once per month.  Father also called G.A. through FaceTime twice per week.

In March 2024, DPSS spoke to Mother.  Mother told the social worker that she had relapsed and was not in a substance abuse program.

At the contested jurisdiction hearing, the court sustained the petition and removed G.A. from Mother's custody.  The court terminated Mother's services, reduced the parents' visitation to once per month, and set the matter for a selection and implementation hearing.

V.    *Section 366.26 hearing*

In July 2024, the paternal aunt reported that G.A. was very healthy.  He was an active toddler with no physical disabilities.  He was walking, running, and climbing, and his motor skills were well developed.  G.A. was very attached to the paternal aunt and to

her 13-year-old son. The paternal aunt wanted to "create a stable, consistent, safe, and family oriented environment for [G.A.]" The 13-year-old-son said that he plays with G.A., and they watch cartoons together. He said that the paternal aunt was a "'good mom'" and "makes you feel safe." G.A. had been in the paternal aunt's care for more than half of his life, and the paternal aunt was committed to adopting him. DPSS reported that G.A. looked to the paternal aunt "for comfort, smile[d] at her, and play[ed] with her."

At the contested selection and implementation hearing in August 2024, Father was present, and Mother did not appear. Father's counsel objected to the termination of parental rights. Counsel argued that Father had consistently visited G.A. and that those visits were frequent, interactive, and "very positive."

The juvenile court found that Father had consistently visited G.A. The court further found that the "benefit from frequent and loving contact between [Father] and [G.A.] was insufficient to overcome the benefits that will occur to [G.A.] from a grant of permanency and knowing [he] is with a forever family. [¶] [E]ven if a reviewing court finds that there is a substantial positive emotional attachment to this child and [Father], notwithstanding the Court's findings, I believe that [F]ather fails to show that termination of that relationship would be detrimental to [G.A.]." Finding that no exceptions applied, the court terminated parental rights.

## DISCUSSION

Father argues that the juvenile court erred by determining that the beneficial parental relationship exception did not apply. We are not persuaded.

11

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that adoption would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *In re Caden C*. (2021) 11 Cal.5th 614, 630-631 (*Caden C*.).) The exceptions allow "'the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C*., at p. 631.)

Under the beneficial parental relationship exception, the parent bears the burden of proving three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C*., *supra*, 11 Cal.5th at pp. 631, 636.)

We review the juvenile court's findings on the first two elements for substantial evidence. (*Caden C*., *supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship is a discretionary determination and hence is reviewed for abuse of discretion. (*Id*. at p. 640.) But we review any factual findings underlying that decision for substantial evidence. (*Ibid*.)

When a trial court assesses whether the child would benefit from continuing the relationship, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Caden C*., *supra*, 11 Cal.5th at p. 632.)

When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C*., *supra*, 11 Cal.5th at p. 632; citing *In re Autumn H*. (1994) 27 Cal.App.4th 567, 575 (*Autumn H*.).) The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H*., at p. 575.) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S*. (2017) 8 Cal.App.5th 636, 646, disapproved on other grounds in *Caden C*., at pp. 637-638, fns. 6, 7.)

In determining whether the exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575; see *Caden C*., *supra*, 11 Cal.5th at p. 633.)

No party challenges the court's finding that Father maintained regular visitation and contact with G.A. We agree that the finding is supported by substantial evidence. And we assume for the sake of argument that there was a substantial, positive emotional attachment between G.A. and Father.

The third element is whether G.A. shared such a "substantial, positive attachment" to Father (*Caden C.*, *supra*, 11 Cal.5th at p. 636) that the harm in severing the parental relationship would "outweigh[ ] 'the security and the sense of belonging a new family would confer'" (*id.* at p. 633).

The juvenile court did not abuse its discretion by concluding that the benefits of G.A.'s relationship with Father were not so great that termination of parental rights would be detrimental to G.A. It does not appear that G.A. has ever resided with Father, and the evidence does not indicate that G.A. had any more attachment to Father than to any other friendly visitor. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) And the evidence does not show that G.A. derived any benefits from the relationship other than Father's "'frequent and loving contact.'" (*Ibid.*) As the trial court noted, a "permanent home with . . . the paternal aunt, would be such a stable environment that it would alleviate any emotional instability or preoccupation that would occur from termination of the parental rights." Moreover, there is no evidence that G.A. suffered any adverse emotional effects when Father's visits concluded or when they were reduced to once per month.

In contrast, the evidence showed that G.A. would gain significant benefits from adoption by the paternal aunt. He had been living with her for over one and one-half years, and he was thriving and developing in her care. He was in good health and did not have any emotional or behavioral issues. He was eating and sleeping well in her care, and he was "very attached" to her. He looked to her for comfort. And the social worker observed that the paternal aunt was "attentive to [G.A.] and his needs."

14

In sum, there was no evidence that termination of parental rights would greatly harm G.A., and there was ample evidence of the significant benefits that G.A. would gain from adoption. The court therefore did not abuse its discretion by determining that Father's relationship with G.A. did not promote his well-being to such a degree as to outweigh the benefits he would derive from a permanent, adoptive home with the paternal aunt.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

CODRINGTON
Acting P. J.

RAPHAEL
J.

15